**COURT OF APPEALS
DECISION
DATED AND FILED**

**January 30, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2018AP1433**

Cir. Ct. No. 2016CV2892

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT IV**

JOHN M. SCHUEPBACH AND PATRICIA A. SCHUEPBACH,

PLAINTIFFS,

FARMERS & MERCHANTS STATE BANK,

INVOLUNTARY-PLAINTIFF,

V.

LEISTIKOW PROPERTIES, LLC C/O LARRY RAY LEISTIKOW,

DEFENDANT,

LOGA INVESTMENTS, LLC C/O MINDY KAY LEISTIKOW,

DEFENDANT-RESPONDENT,

BANK OF DEERFIELD,

DEFENDANT-THIRD-PARTY
PLAINTIFF-APPELLANT,

V.

ESTATE OF LARRY LEISTIKOW, MINDY LEISTIKOW AND TRIGGS
PLUMBING COMPANY, INC.,

    THIRD-PARTY DEFENDANTS.

---

        APPEAL from an order of the circuit court for Dane County: VALERIE BAILEY-RIHN, Judge. *Affirmed*.

        Before Fitzpatrick, P.J., Graham and Nashold, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

    ¶1    PER CURIAM. This case arose out of actions by the Bank of Deerfield when it took possession of a bar as part of a foreclosure action in which the Bank had been appointed as receiver. The Bank's action resulted in the bar's closure.

    ¶2    At the time the Bank took possession, Leistikow Properties, LLC owned the bar's real estate. Loga Investments, LLC owned the bar's business, Mindy's Silver Fox Bar & Grill, and the bar's personal property, including liquor, food, furniture, fixtures, and the money in the till.

    ¶3    In response to the Bank's conduct, Loga filed a cross-claim to the foreclosure action, which is the subject of this appeal. Loga's cross-claim alleged that, as a result of the Bank's shutdown of Loga's business and confiscation of Loga's property, the Bank committed conversion, civil theft, and trespass.

¶4   After a three-day bench trial, the circuit court issued a decision in favor of Loga on all claims, and awarded Loga damages. The Bank appeals three of the court's determinations: (1) the civil theft judgment; (2) the resulting exemplary damages award; and (3) the circuit court's calculation of actual damages for conversion.

¶5   For the reasons set forth below, we affirm the circuit court's ruling in all respects.

## BACKGROUND

### I. The Bar's Purchase and Organization

¶6   In 2005, Mindy and Larry Leistikow offered to purchase the bar for $350,000 from John and Patricia Schuepbach. The Schuepbachs financed half of the price, while the Bank financed the other half. The purchase included the real estate and all of the contents of the bar.

¶7   Before the purchase, the Leistikows created two separate business entities: Leistikow Properties, which owned the real estate, and Loga Investments, which owned and operated the bar's business and owned the bar's personal property. At closing, Leistikow Properties was the sole purchaser.

¶8   The Bank secured its loan with an interest in the bar's real estate and by executing a Commercial Security Agreement with Leistikow Properties. The Security Agreement gave the Bank a security interest in Leistikow Properties' personal property. Under the Security Agreement, Leistikow Properties could not transfer or otherwise encumber ownership of the secured property without the Bank's written consent.

¶9      However, the Bank never gained a security interest in Loga's property.  And, consistent with its initial formation, the bar maintained its dual structure:  Loga and Leistikow Properties owned separate bank accounts; Loga paid Leistikow Properties rent for use of Leistikow Properties' real estate; and Loga bought, sold, and owned all of the personal property for running the business.

## II. *The Foreclosure*

¶10     The sequence of events that led to the current appeal began in July 2016.  At that time, the promissory note owed by the Leistikows to the Schuepbachs came due and was not renewed.  In November 2016, the Schuepbachs filed a foreclosure complaint naming all interested parties, including Leistikow Properties, Loga, and the Bank.  There was no dispute that Leistikow Properties was in default, and on December 15, 2016, the circuit court appointed the Bank as the receiver to oversee the foreclosure.  The receivership order granted the Bank, as receiver, the power to enter and take possession of the premises and to take possession of the "personal property owned by Leistikow Properties, LLC."  Pursuant to negotiations between the Bank and counsel for Loga, the Bank's powers as receiver were "subject to the rights of tenants."  Loga was then a tenant of Leistikow Properties.

¶11     On December 28, 2016, thirteen days after being appointed receiver, the Bank took possession of the bar and the property contained therein without giving any prior notice.  This included changing the locks and security system, and physically barring the Leistikows from entering the property.  By its actions, the Bank effectively shut the business down.

¶12     On the day of the shutdown, counsel for Loga and Leistikow Properties, Timothy Peyton, informed the Bank that his clients strongly objected to the Bank's actions.  Specifically, counsel communicated that Loga ran the business and was leasing the premises from Leistikow Properties.  Counsel further stated that the Bank had no right to Loga's personal property.  The Bank responded, asserting that it was unaware of any lease agreement between Leistikow Properties and Loga, and that it would continue its possession of the premises and all of the property located within the premises.  The bar remained closed until it was sold at a sheriff's sale approximately eight months later.

### III. The Cross-Claim and Trial

¶13     Approximately four months after the shutdown, Loga filed a cross-claim alleging that the Bank had engaged in (1) conversion; (2) civil theft; and (3) trespass.  As the remedy, Loga sought actual damages, exemplary damages, punitive damages, statutory costs, attorney's fees, investigation costs, and the return of its property.

¶14     The basis of Loga's cross-claim was that Loga was a tenant of Leistikow Properties; that the Bank had no rights to Loga's property; and that the Bank wrongfully shut down Loga's business, Mindy's Silver Fox, and confiscated all of Loga's personal property, including liquor, food, furniture, fixtures, and the money in the till.

¶15     The Bank's theory was that it had a superior legal right to the personal property under the Security Agreement.  Specifically, the Bank noted that the Security Agreement required Leistikow Properties to obtain written permission from the Bank before transferring its secured personal property to another entity.  Under this theory, even if Leistikow Properties had assigned ownership rights to

Loga, the Bank could not have committed the alleged offenses as a matter of law because the Bank's rights superseded Loga's. The Bank also argued that, at a minimum, it had a good faith belief that it could lawfully take possession of the bar's personal property. The parties did not reach an agreement, and Loga's cross-claims eventually went to trial.

¶16 After a three-day bench trial, the circuit court issued a written decision, finding in favor of Loga on all claims. The court awarded Loga $135,655 in damages: $53,175 for conversion, $75,000 for exemplary damages for civil theft, and $7,480 for trespass.

¶17 With respect to the conversion and civil theft cross-claims,[1] the court concluded that Loga was the owner of the personal property in the bar and that the Bank had no security interest in Loga's property. The court further concluded that, even if the Bank had originally had a security interest in the personal property in the bar, after nearly eleven years of operation the original secured property had been "replaced, commingled and [had become] untraceable," such that the 2005 Security Agreement did not give the Bank a security interest in Loga's personal property in 2016.[2] In concluding that the Bank engaged in civil theft, the court found that the Bank's actions of taking possession of and selling Loga's personal property were "intentional, deliberate and malicious."

---

[1] We omit details related to the trespass cross-claim as that issue is not before us on appeal. We include some details regarding the conversion cross-claim, even though the Bank does not appeal that determination, because it is interrelated to the civil theft determination, which the Bank does appeal.

[2] The Bank does not challenge this conclusion on appeal.

## DISCUSSION

¶18 The Bank does not challenge the circuit court's findings of conversion and trespass, but instead raises three issues on appeal. First, the Bank argues that the court erred as a matter of law by holding the Bank liable for civil theft based on "mere knowledge of Loga Investments' claims" to the personal property in the bar, without finding that the Bank had the requisite criminal intent. Second, the Bank contends that, because it is not guilty of civil theft, the court erred in awarding exemplary damages. And third, the Bank argues that the court erred in calculating actual damages on the conversion cross-claim. We address each issue in turn.

### I. Civil Theft

¶19 WISCONSIN STAT. § 895.446,[3] the civil theft statute, "provides a cause of action for '[p]roperty damage or loss caused by crime' by reference to enumerated criminal statutes." *Estate of Miller v. Storey*, 2017 WI 99, ¶12 n.6, 378 Wis. 2d 358, 903 N.W.2d 759. The crime of theft under WIS. STAT. § 943.20 is included in the enumerated criminal statutes of the civil theft statute. *See* § 895.446(1) ("Any person who suffers damage or loss by reason of intentional conduct ... that is prohibited under s. ... 943.20 … has a cause of action against the person who caused the damage or loss."). To commit civil theft, a defendant must have the requisite intent to take possession of another's property without consent and to deprive the owner permanently of possession of the property. *See Miller*, 378 Wis. 2d 358, ¶40 & n.16; *see also* WIS JI—CRIMINAL 1441. The burden of

---

[3] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

proof for a civil theft claim is to prove a violation by a "preponderance of the credible evidence." WIS. STAT. § 895.446(2).

¶20    In its decision, the circuit court correctly articulated this standard, stating:   "To support a civil theft claim ... the court must find that the Bank intentionally took possession of [Loga's] personal property without consent and with the intent to deprive the owner permanently of the value of the property." Under this rubric, the circuit court concluded that the Bank had committed civil theft.

¶21    The Bank argues that the circuit court erred by predicating the Bank's liability on "mere **knowledge** of Loga Investments' **claims** to property rather than finding the requisite criminal intent that civil theft demands."[4] Relatedly, the Bank asserts that the circuit court erroneously "ignored" the "substantial evidence of the Bank's good faith claim" to the relevant property.  *See Lechner v. Ebenreiter*, 235 Wis. 244, 251, 292 N.W. 913 (1940) ("taking [property] openly in the honest belief of ownership ... and of right to take or retain it absolves [the defendant] from felonious intent").

¶22    We reject the Bank's argument because it is premised on an incorrect characterization of the circuit court's decision.  The court did not base its

---

[4] The Bank argues that this was an error of law.  However, in so arguing, the Bank mischaracterizes the issue.  While the application of legal standards to a state of mind is a matter of law, whether the evidence demonstrates that a party had a certain state of mind in the first place is a question of fact, and we discuss it as such.  *See Cody v. Dane Cty.*, 2001 WI App 60, ¶15, 242 Wis. 2d 173, 625 N.W.2d 630 ("state of mind is a question of fact, and one which can be proven by inference from circumstantial evidence"); *State v. Olson*, 179 Wis. 2d 715, 720, 508 N.W.2d 616 (Ct. App. 1993) (juror's state of mind is a question of fact); *see also Fact*, BLACK'S LAW DICTIONARY, at 709 (10th ed. 2014) ("Facts include ... states of mind such as intentions and the holding of opinions.").

decision on the Bank's "mere knowledge" of Loga's "claims." And, rather than "ignoring" the Bank's argument that it acted in good faith, the court explicitly considered and then rejected it. Indeed, the court found that the Bank's acts were "intentional, deliberate and malicious."[5] In addition, the court noted "the Bank's *deliberate* decision to sell property not belonging to it" and stated that the court was "*not convinced that this was an innocent mistake*" but was "a *deliberate* action to shut down the business without notice and right before the busiest time of the year" (emphasis added). The circuit court's characterization of the Bank's conduct was supported by the facts of record. We detail some of those facts below.

¶23     The court found that the personal property in the bar, which the Bank took and sold, "was owned by Loga." The court noted that there was a lease between Loga and Leistikow Properties under which Loga would lease the real estate used for the bar business, that Loga paid rent to Leistikow Properties, and that Mindy Leistikow credibly testified that the personal property was the property of the bar business and that all of the purchases were made from funds in the Loga account.

¶24     On the issue of criminal intent, the circuit court relied heavily on the actions of the Bank's vice-president, Bruce Gibson. Gibson was a veteran loan officer with approximately 40 years of experience in the industry, and he was aware of the common practice of setting up two entities to run a business such as the bar. As the primary officer assigned to the Leistikow Properties loan during its

---

[5] This finding contradicts the Bank's unfounded assertion on appeal that "no malice was proven or found."

eleven-year term, Gibson regularly corresponded with, and collected financial information from, both Leistikow Properties and Loga. Gibson was aware that two separate checking accounts were opened, one for Loga and one for Leistikow Properties. When the Bank first issued the loan to Leistikow Properties, Gibson's contemporaneous notes stated: "Business checking to be Loga Investments, LLC doing business as Mindy's Silver Fox Bar & Grill." In addition, all of the checks used to operate the business over the eleven-year relationship with the Bank stated: "LOGA INVESTMENTS LLC D/B/A MINDY'S SILVER FOX BAR & GRILL." Further, just three weeks before the foreclosure action, when evaluating Leistikow Properties' refinancing request, Gibson requested income taxes from both Leistikow Properties and Loga.

¶25 Moreover, in July 2016, after speaking with Larry Leistikow about the Bank's loan to Leistikow Properties,[6] Gibson's contemporaneous notes and an email to Mr. Leistikow reflect Gibson's determination that the Bank should consider obtaining a general business security agreement and guaranty from Loga for any definable assets. However, the Bank never did so. The court noted that Gibson's boss, Darren Winkler, was also familiar with the practice of businesses setting up two entities, one to own the real estate and another to operate the business, with the court observing: "In that event, the Bank would take a security interest in the property of both entities." The court also noted Winkler's testimony that "there was sufficient information in the file to alert Mr. Gibson to the question whether the Bank had collateral in Loga Investments."

---

[6] Because Larry Leistikow passed away before trial, Gibson was the only available witness as to the content of their conversations.

¶26    The circuit court concluded that Gibson's experience, his notes, and his request for Loga's financial information evidenced knowledge of Loga's ownership of the personal property in the bar. The court did not find Gibson's testimony to the contrary credible.

¶27    The court also noted that, in the Bank's own pleading, filed only 26 days before the shutdown, the Bank asserted that, "[u]pon information and belief, [the real estate] is currently occupied by Defendant Loga Investments LLC" and that, "[u]pon information and belief, the property ... is under the control of Defendant Leistikow Properties, LLC and/or Loga Investments, LLC." The court found that "[a] person with [Gibson's] experience as a Bank officer, had plenty of evidence that Loga Investments was operating the Bar, from the very first note he wrote in the loan file to the pleadings filed on the Bank's behalf."

¶28    The court also relied on the testimony of Attorney Timothy Peyton, who the court found "extremely credible." The court noted that when Attorney Peyton answered the original complaint in the foreclosure action, he alleged that the Bank had no interest or lien in Loga's property, and this information was conveyed to the Bank's attorney. The court further noted that, after the Bank agreed to act as receiver for the property, Attorney Peyton was concerned about protecting Loga's personal property from the receiver and "informed the Bank's counsel that Loga Investments was a tenant operating the Bar." This communication resulted in changes being made to the receivership order to allow for possession of the property by the  receiver "subject to the rights of the tenants." In addition, after the Bank took possession of the bar, Attorney Peyton sent correspondence to the Bank's attorney asserting that Loga owned the personal property in the bar and was a tenant, and seeking to have possession returned to Loga. The court noted that the Bank's attorney did not testify to rebut Attorney

Peyton's testimony and that the court could therefore infer that the testimony of the Bank's attorney would have been consistent with that of Attorney Peyton.

¶29    The court also noted the deposition testimony of another Bank officer that, even if the Bank understood that Loga owned the personal property, "it would have basically done what it did." The court characterized this testimony as "telling," and further concluded:

> Despite knowing that Loga Investments claimed ownership in the Bar property, the Bank went ahead with its plans to shut down the business unannounced. Compounding these acts, the Bank refused to release the personal property and sold it in order to make the Bank whole.... [T]he only conclusion this Court could draw from the testimony was that the Bank did not care about the legal ramifications of its actions. *It knew that it had made a mistake in not securing the collateral owned by Loga Investments, which it could have [done] over the course of the 11 year relationship. When it determined in 2016 that it had made a mistake, it failed to [remedy] that error and insisted on its position regardless of the outcome.*

(Emphasis added.)

¶30    Thus, contrary to the Bank's assertions, the circuit court did not base its decision on the Bank's "mere knowledge" of Loga's "claim" to its personal property, nor did the court ignore evidence of the Bank's good faith belief. Rather, the court's decision was based on its correct interpretation of the civil theft statute, the court's determination that the Bank knew that it did not have a security interest in the personal property, and the court's finding that the Bank's actions were "intentional, deliberate and malicious," which, as Loga states, is the antithesis of good faith. The Bank has failed to show that any of the court's findings were clearly erroneous. *See, e.g.,* WIS. STAT. § 805.17(2) (findings of

12

fact not to be set aside unless clearly erroneous); ***Cody v. Dane Cty.***, 2001 WI App 60, ¶15, 242 Wis. 2d 173, 625 N.W.2d 630 (state of mind is question of fact).

## II. Exemplary Damages

¶31    Upon concluding that the Bank engaged in civil theft of Loga's property, the court awarded $75,000 in exemplary damages pursuant to WIS. STAT. § 895.446(3)(c), which allows for treble damages. The Bank's challenge to the exemplary damage award is predicated on its theory that the circuit court erroneously found it liable for civil theft. Having found no error in that regard, we find no error in the circuit court's award of exemplary damages.[7]

## III. Actual Damages

¶32    On review of a circuit court's damages award, "[w]e apply a highly deferential standard of review to damage awards, affirming if there is any credible evidence which under any reasonable view supports the finding." ***Selmer Co. v. Rinn***, 2010 WI App 106, ¶28, 328 Wis. 2d 263, 789 N.W.2d 621; *see also* ***Cianciola, LLP v. Milwaukee Metro. Sewerage Dist.***, 2011 WI App 35, ¶21, 331 Wis. 2d 740, 796 N.W.2d 806 (applying clearly erroneous standard). Damages must be proven with reasonable certainty, not with mathematical precision. *See* ***Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.***, 206 Wis. 2d 158, 189, 557 N.W.2d 67 (1996).

---

[7] The Bank makes a "public policy" argument that is likewise dependent on its assertion that it acted in good faith. Because the Bank has not shown that the court erred in rejecting the Bank's good faith claim, we need not address the Bank's public policy argument.

¶33 The Bank asserts that the circuit court erred in calculating actual damages for conversion because, according to the Bank, the court relied "entirely on Mindy Leistikow's unsupported testimony and spreadsheets." Relying on *Graff v. Tinkham*, 202 Wis. 141, 147, 231 N.W. 593 (1930), the Bank states that, although a property owner may testify regarding its value, "such testimony is not binding" if it is based on guess and conjecture or is arbitrary and misleading. The Bank's characterization of the evidence is unsupported.

¶34 Mindy Leistikow testified as the business owner who had personal knowledge of Loga's property. As part of the trial, Ms. Leistikow prepared a spreadsheet with a list of items that she alleged the Bank converted, along with values for each item. Ms. Leistikow testified that she prepared the spreadsheet based on invoices, pictures of the inventory in the bar, and her recollections. When she could not remember the value of an item or find an invoice, Ms. Leistikow searched the Internet for prices. The circuit court credited Ms. Leistikow's testimony. The court also found that the Bank had submitted no credible evidence rebutting Ms. Leistikow's valuation.

¶35 Furthermore, "'Wisconsin case law is clear that an owner of property may testify as to its value and that such testimony may properly support a jury verdict for damages, even though the opinion is not corroborated or based on independent factual data.'" *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶67, 314 Wis. 2d 560, 757 N.W.2d 803 (quoted source omitted).

¶36 In short, the Bank has failed to show that the court improperly relied on Ms. Leistikow's testimony and spreadsheets, or that the damages award was clearly erroneous.

## CONCLUSION

¶37    For the reasons stated, we affirm.

*By the Court.*—Order affirmed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)5.